1
2
3
4
5
6

GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

7    *Attorneys for Plaintiffs*

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10   | SAL MUNOZ and SHIRLEY VANASCH, individuals, on behalf of themselves, the general public, and those similarly situated, | CASE NO. |
|---|---|
| | CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT |
| Plaintiffs, | |
| v. | |
| GOFUNDME INC., | |
| Defendant. | |
| | JURY TRIAL DEMANDED |

- 1 -
CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................. 3

THE PARTIES.................................................................................................. 4

JURISDICTION AND VENUE ........................................................................ 5

SUBSTANTIVE ALLEGATIONS .................................................................... 5

    A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ............................................. 5

    B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies. .................................................................................... 11

    C.    The Private Communications Intercepted and Collected Through the Third Party Cookies on Defendant's Website.................................................. 15

        1.    The Website Causes the Interception of the Contents of Communications. ....................................................................................................... 15

        2.    Google Cookies.................................................................... 16

    D.    The Third Parties Intercept User Communications While in Transit ................. 24

    E.    The Private Communications Collected are Valuable. ........................................ 26

PLAINTIFFS' EXPERIENCES ...................................................................... 27

CLASS ALLEGATIONS ................................................................................ 33

CAUSES OF ACTION .................................................................................... 35

    First Cause of Action: Invasion of Privacy........................................................ 35

    Second Cause of Action: Intrusion Upon Seclusion.......................................... 37

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)........................................................ 39

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ................................. 44

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation............. 45

    Sixth Cause of Action: Unjust Enrichment........................................................ 48

PRAYER FOR RELIEF .................................................................................. 49

Plaintiffs Sal Munoz and Shirley VanAsch ("Plaintiffs") brings this action on behalf of themselves, the general public, and all others similarly situated against GoFundMe Inc. ("Defendant" or "GoFundMe"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on Plaintiffs' personal knowledge.

## **INTRODUCTION**

1.    This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's ecommerce website (www.gofundme.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can choose to "Reject all" cookies, as shown in the following screenshot:



2.    Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3.    Even after users elect to "Reject all" cookies, Defendant nonetheless caused multiple third parties—including Google LLC (DoubleClick and Google), and others (the "Third

CLASS ACTION COMPLAINT

Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website.

4.    Contrary to users' express rejection of cookies and tracking technologies, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs' and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5.    The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6.    This type of tracking and data sharing is exactly what Website visitors sought to avoid when they clicked or selected the "Reject all" button on the Website's cookie consent banner. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiff and those similarly situated Website users.

## **THE PARTIES**

7.    Plaintiff Sal Munoz is, and was at all relevant times, an individual and resident of Fairview, California. Plaintiff Munoz intends to remain in California and makes his permanent home there.

CLASS ACTION COMPLAINT

8.      Plaintiff Shirley VanAsch is, and was at all relevant times, an individual and resident of Oakland, California. Plaintiff intends to remain in California and makes her permanent home there.

9.      Defendant GoFundMe Inc. is a Delaware corporation with its headquarters and principal place of business in California.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

11.      The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12.      Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

13.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14.      Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

A.      **Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.**

15.      Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request

tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

16.     An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

17.     As a result, Defendant knew or should have known that the devices used by Plaintiff and Class members to access the Website were located in California.

18.     Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

19.     The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

20. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

21. A third-party cookie is set by a third-party domain/webserver (e.g., www.google.com; fls.doubleclick.net; play.google.com; adservice.google.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

22. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

CLASS ACTION COMPLAINT

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

23.    Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

24.     Defendant specializes in providing an online platform for fundraising by individuals and organizations. Defendant owns and operates the Website, which allows visitors to access its online fundraising platform to either give or receive money for various fundraising efforts. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

25.     Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

26.     Defendant explained the third-party cookies it used on the Website as follows in its Cooke Policy:

> A cookie is a small text file of letters and numbers stored on your browser or device. When you interact with the Sites, we try to make that experience simple and meaningful. Our Sites use Cookies to distinguish you from other visitors to our Sites. This helps us to provide website functionality to you, understand our visitors, and improve our Sites.
>
> When you visit our Sites, both first-party and third-party Cookies may be placed on your browser or device. First-party Cookies are those placed directly by us or from our website domain. Third-party Cookies are those placed by our vendors or partners, which may include social networking and advertising services. Both types of Cookies allow us or our vendors or partners to access information about your device and visit. We use both persistent Cookies and session Cookies. Persistent Cookies stay on your browser until they are deleted or expire. Session Cookies last until you close our Sites or your browser.
>
> …

CLASS ACTION COMPLAINT

We use Cookies for the following purposes:

• **Strictly Necessary or Essential Cookies.** These are essential Cookies that are enabled by default because they are necessary to operate our Sites. They include, for example, Cookies that enable you to log in, complete forms, display our content, and make donations. They also enable us to identify and prevent security risks and comply with our legal obligations.

• **Functional Cookies.** These Cookies allow us to enable additional functionality (e.g., third-party video or audio), remember your settings and preferences (e.g., language or region), and customize or personalize your experience (e.g., greeting you or recommending content based on prior visits).

• **Analytics Cookies.** These Cookies allow us to recognize and count visitors and understand how you interact with our Sites. They help us to know how visitors reach our Sites, analyze usage patterns, and improve our Sites (e.g., by ensuring that users find what they are looking for). These Cookies may also be used to limit the number of times you see our online advertisements and to measure the effectiveness of our advertising campaigns.

• **Advertising Cookies.** These Cookies use information about your activity on our Sites (e.g., pages you view and links you click) to deliver advertisements that are relevant to your interests and optimize our ad campaigns on third-party websites and apps. This includes our ads on social media platforms. These Cookies may also share information through social media "share" or other similar features on our Sites, or when you engage with our content on or through a social media platform such as LinkedIn, Facebook, and X/Twitter. If you disable these Cookies, you may still see our ads on thirdparty websites or apps, but they will be less relevant to you.

…

The vendors we use to help us understand and analyze how visitors use our services, and to improve the Sites, may collect the following types of information from users of our Sites: device IP Address, device screen size, device type (unique device identifiers), browser information, geographic location, preferred language used to display the Sites, and details about your use of the Sites.[1]

---

[1] GoFundMe Website Cookie Policy (updated May 27, 2025) (available at https://www.gofundme.com/c/gofundme-cookie-policy) (the "Cookie Policy"). Defendant has subsequently updated its Cookie Policy.

CLASS ACTION COMPLAINT

**B.** **Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies.**

27.     When Plaintiff and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "We use cookies[.] By clicking 'Accept all', you agree to the storing of cookies on your device for functional, analytics, and advertising purposes." Then, users were presented the option to click "Accept All," "Reject All," or "More choices," as shown in the following screenshot from the Website:



28.     Plaintiffs and other Website users who clicked or selected the "Reject all" button, indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website (or, at the very least, decline or reject all "functional, analytics, and advertising" cookies, other than those "Strictly Necessary or Essential Cookies" needed for the Website to function),[2] could then continue to browse the Website, as the popup cookie consent banner disappeared.

29.     Defendant's popup cookie consent banner led Plaintiffs, and all those Website users similarly situated, to believe that they had declined or rejected all cookies and tracking technologies, especially those used for "functional, analytics, and advertising purposes[,]" except those cookies strictly necessary or essential for the Website to function. The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private

---

[2] Although not fully explained on the popup cookie consent banner, the GoFundMe Cookie Policy explains there are at least four categories of cookies in use on the Website, including Strictly Necessary or Essential Cookies, Functional Cookies, Analytics Cookies, and Advertising Cookies. Defendant states that Strictly Necessary or Essential cookies "are enabled by default because they are necessary to operate our Sites." However, Defendant makes no similar representation for any other category of cookies and at least implies that Advertising Cookies can be "disable[d]."

CLASS ACTION COMPLAINT

Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Reject all" button.

30.     Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiff or other users' wishes. When Plaintiff and other Website users clicked or selected the "Reject all" button, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

31.     Nevertheless, even after receiving that notice, Defendant caused the Third Parties' cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

32.     In particular, when users clicked or selected the "Reject all" button, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

33.     Some aspects of the operations of the Third Parties' cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user clicked or selected the "Reject all" button on the Website's popup cookie consent banner, as shown in the following screenshot:

CLASS ACTION COMPLAINT

ad-to-recovery

| | Elements | Console | Sources | Network | Performance | Memory | Application | Security |

⏺ ⊘ | ▼ 🔍 | ☑ Preserve log | ☐ Disable cache | No throttling ▼ | 🔗 | ⬆ | ⬇

Filter | ☐ Invert | ☐ Hide data URLs | ☐ Hide extension URLs | All | Doc | JS | Fetch/XHR

☐ Big request rows

☐ Overview

| Name | Method | Status | Domain | Cookies ▼ |
|---|---|---|---|---|
| i?js_src=https://c.paypal.com/da/r/f... | GET | 200 | c.paypal.com | 14 |
| js?components=buttons&currency=... | GET | 200 | www.paypal.com | 14 |
| p2 | POST | 200 | c.paypal.com | 14 |
| p1 | POST | 200 | c.paypal.com | 14 |
| fb.js | GET | 200 | c.paypal.com | 14 |
| logger?disableSetCookie=true | POST | 200 | www.paypal.com | 14 |
| logger?disableSetCookie=true | POST | 200 | www.paypal.com | 14 |
| w?f=c989c8856e1c1383b711c5cd8... | GET | 204 | c.paypal.com | 14 |
| ts?pgrp=muse%3Aoffer%3A%3A%... | GET | 200 | t.paypal.com | 14 |
| ts?pgrp=muse%3Aoffer%3A%3A%... | GET | 200 | t.paypal.com | 14 |
| ts?pgrp=muse%3Athird-party%3Aa... | GET | 200 | t.paypal.com | 14 |
| pptm.js?id=www.gofundme.com&t=... | GET | 200 | www.paypal.com | 14 |
| p3?f=c989c8856e1c1383b711c5cd... | GET | 200 | c6.paypal.com | 14 |
| counter.cgi?i=127.0.0.1&p=c989c88... | GET | 302 | b.stats.paypal.com | 14 |
| counter2.cgi?i=127.0.0.1&p=c989c8... | GET | 200 | chd.stats.paypal.com | 14 |
| js?components=buttons&currency=... | GET | 200 | www.paypal.com | 14 |
| fb.js | GET | 200 | c.paypal.com | 14 |
| buttons?style.label=paypal&style.lay... | GET | 200 | www.paypal.com | 14 |
| enterprise.js | GET | 200 | www.google.com | 3 |
| activityi;src=13981538;type=gfm;cat... | GET | 302 | 13981538.fls.doubleclick.net | 2 |
| activityi;dc_pre=CMm71pjOzIMDFd... | GET | 200 | 13981538.fls.doubleclick.net | 2 |
| log?format=json&hasfast=true&auth... | POST | 200 | play.google.com | 2 |
| log?format=json&hasfast=true&auth... | POST | 200 | play.google.com | 2 |
| log?format=json&hasfast=true&auth... | POST | 200 | play.google.com | 2 |
| log?format=json&hasfast=true&auth... | POST | 200 | play.google.com | 2 |
| log?format=json&hasfast=true&auth... | POST | 200 | play.google.com | 2 |
| log?format=json&hasfast=true&auth... | POST | 200 | play.google.com | 2 |
| log?format=json&hasfast=true&auth... | POST | 200 | play.google.com | 2 |
| log?format=json&hasfast=true&auth... | POST | 200 | play.google.com | 2 |
| dc_pre=CMm71pjOzIMDFdXi_QUd... | GET | 200 | adservice.google.com | 2 |
| resources?apikey=nnmhbvv6sq4vztf... | GET | 200 | sidebar.bugherd.com | 1 |
| 8aaeb48f-a8e6-4725-820c-b18c4f7... | GET | 200 | sync.transcend.io | 0 |
| embed_html?apikey=nnmhbvv6sq4... | GET | 200 | sidebar.bugherd.com | 0 |
| 8aaeb48f-a8e6-4725-820c-b18c4f7... | GET | 200 | sync.transcend.io | 0 |
| a14721270268.html | GET | 304 | a14721270268.cdn.optimizely.com | 0 |
| id?clientKey=live_QQICZLXALBEQN... | OPTIONS | 200 | checkoutshopper-live.adyen.com | 0 |
| log?clientKey=live_QQICZLXALBEQ... | OPTIONS | 200 | checkoutshopper-live.adyen.com | 0 |
| index.html | GET | 200 | www.paypalobjects.com | 0 |

(image above enlarged to enhance readability)

CLASS ACTION COMPLAINT

34.     The screenshot above shows the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.gofundme.com. The screenshots depict only network traffic occurring *after* the user rejected all cookies using the cookie banner. As shown above, despite the user's rejection of all cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.google.com, fls.doubleclick.net, play.google.com, adservice.google.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all such cookies and tracking technologies by clicking or selecting the "Reject all" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of "all" cookies.

35.     Plaintiff's and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

36.     As users interact with the Website, even after clicking or selecting the "Reject all" button, thereby declining or rejecting the use of cookies and similar technologies for analytics and advertising, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user

- 14 -

data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

37.     The Third Party code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C.    The Private Communications Intercepted and Collected Through the Third Party Cookies on Defendant's Website.[3]**

1.    **The Website Causes the Interception of the Contents of Communications.**

38.     The Website includes a search bar and other input fields which users enter information. For example, below are screenshots of the search bar currently available on the Website where users can type into the search bar to cause the Website to search its contents.[4]



---

[3] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had rejected all non-strictly required cookies using the Website.
[4] Based on information and belief, the same or substantially similar search bar appeared on the Website at all relevant times.

CLASS ACTION COMPLAINT

39.    When users input the information into the search bar, they intend to communicate the contents of their search directly to the Website.

40.    Instead, Defendant programmed the Website so that the contents of those communications are intercepted by the Third Parties while the communications are in transit between the users' browser and the Website.

**2.    Google Cookies.**

41.    Defendant causes third party cookies and other data to be transmitted to and from Website users' browsers and devices, even after users rejected all non-strictly required cookies, to and from the **www.google.com**, **doubleclick.net**, and **analytics.google.com** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[5] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[6] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[7]

---

[5] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).
[6] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.
[7] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

CLASS ACTION COMPLAINT

42.     Defendant's Cookie Policy identifies cookies from Google Analytics as "Digital Analytics" cookies in use on the Website and Google Ads as "Digital Advertising" cookies used on the Website. These cookies are not classified by Defendant in the Cookie Policy as "Essential" cookies.

43.     Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[8] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

44.     Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[9] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[10]

45.     Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data,

---

[8] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).
[9] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).
[10] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

CLASS ACTION COMPLAINT

(v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[11]

46.     For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at analytics.google.com:



47.     The "npa" parameter refers to "Non-Personalized Ads." When npa is set to 1, it indicates the non-personalized ads preference is enabled. Here, npa is set to 0, indicating that standard (personalized) ads are enabled.

48.     The "url" parameter tells Google what page the user is visiting on the GoFundMe website. Here, the url corresponds to the "Teacher Appreciation Quotes" page.

49.     Along with this data, cookie data is also sent to www.google.com:

---

[11] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=63867067566957 6522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

CLASS ACTION COMPLAINT

50.     The "NID" cookie is also used for Google advertising. According to Google documentation, "[t]he 'NID' is used to show Google ads in Google services for signed-out users," and "expires 6 months after a user's last use.[12]

51.     The "__Secure-3PAPISID" and "__Secure-3PSID" cookies used on the Website are utilized by Google to build a profile of Website visitor interests to show relevant and personalized ads through retargeting. When this network request is received by the www.google.com domain, it processes the request and automatically forwards the user's browser to Google's advertising domain, at https://googleads.g.doubleclick.net, using a response header:



52.     This in turn causes the user's browser to visit the url above, sending the following data to doubleclick.net:

---

[12] *See* https://policies.google.com/technologies/cookies?hl=en-US.

CLASS ACTION COMPLAINT

1
2

3
4
5
6
7
8
9
10
11      53.     Defendant's GoFundMe Website also causes consumers' browsers to send data—

12 including cookie data—to Google's analytics domain, at https://www.google-analytics.com:

13
14                    [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



| Key | Value |
| --- | --- |
| _gid | 716071971.1715804173 |
| _s | 1 |
| _u | SCCAAEAjAAAAACAAo~ |
| _v | j101 |
| a | 1002562926 |
| cid | 2062225044.1715804173 |
| de | UTF-8 |
| dl | https://www.gofundme.com/c/supporter-space/teacher-appreciation-quotes |
| dma | 0 |
| dt | Teacher Appreciation Quotes That Will Make You Smile 😊 📚 |
| ea | Marketing Tag |
| ec | User Permission |
| el | false |
| gcd | 13t3t3t3t5 |
| gcs | G111 |
| gjid | |
| gtm | 45He45d0n71TDTFTZv6995711za200 |
| je | 0 |
| jid | |
| ni | 1 |
| sd | 30-bit |
| sr | 1440x900 |
| t | event |
| tid | UA-5577581-4 |
| ul | en-us |
| v | 1 |
| vp | 803x699 |
| z | 706791301 |

CLASS ACTION COMPLAINT

54.     The "cid" parameter above refers to "Client ID." It contains a unique identifier for the user's browser and device, that enables Google to link the user to their interactions with the website.[13]

55.     The "_gid" parameter is designed to be used as a tracking cookie, and to persist on the user's device for 24 hours.[14]

56.     The "dl" and "dt" parameters disclose to Google the exact url and page title that the user was browsing.

57.     The "vp" parameter reviews to the "ViewPort," and discloses to Google the exact size (in pixels) of the user's viewing area on their device. The "sr" parameter refers to "screen resolution," in pixels.

58.     Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" to be sent to Google.

| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/124.0.0.0 Safari/ 537.36 |
| --- | --- |

59.     The user-agent enables Google to determine extensive information about the user's device and browser.

60.     Finally, all requests sent to Google's domains are accompanied by the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

61.     Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a

---

[13] *See, e.g.*, https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters/; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data/; https://www.owox.com/blog/use-cases/google-analytics-client-id/.
[14] *See* https://business.safety.google/adscookies/.

CLASS ACTION COMPLAINT

consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

62. Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[15]

63. Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[16] Thus, Google has the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

---

[15] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).
[16] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

CLASS ACTION COMPLAINT

**D.**  **The Third Parties Intercept User Communications While in Transit**

64.    On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendants' Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

65.    First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

66.    Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[17] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action. This deduplication occurs as the communications are received, before they are stored.

67.    Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

---

[17] For example, Google's server-to-server API is the **Google Ads Conversion API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

CLASS ACTION COMPLAINT

68.     Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

69.     To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

70.     For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[18] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[19] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources, ***transform the data***, and write the data to a destination."[20] One use for Dataflow is the "[r]eal-time machine learning (ML) analysis of streaming data."[21] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[22]

---

[18] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.

[19] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.

[20] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).

[21] *Id.*

[22] *Id.*

CLASS ACTION COMPLAINT

71.    On information and belief, the other Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage.

72.    Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendants' Website.

**E.    The Private Communications Collected are Valuable.**

73.    As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiff's and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiff and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

74.    The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular marketing campaigns and then target those users with advertisements for similar campaigns both on the Website and across unrelated third-party websites.

75.    Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader consumer fundraising market.

Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

76.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[23] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id.* "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id.*

77.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell their data or the consumer's willingness to pay to protect their information.

78.    By falsely representing consumers' ability to reject cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

### Plaintiff Sal Munoz

79.    Plaintiff Munoz visited the Website to seek and obtain information about GoFundMe's services and/or view certain fundraising campaigns, while located in California, on one or more occasions during the last four years.

80.    Plaintiff Munoz's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's services and fundraising campaigns. Specifically, Plaintiff Munoz is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

---

[23] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

81.     When Plaintiff Munoz visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Reject all" cookies button. Plaintiff Munoz viewed Defendant's representation on the popup cookie consent banner that, "We use cookies[.] By clicking 'Accept all', you agree to the storing of cookies on your device for functional, analytics, and advertising purposes." Plaintiff Munoz also viewed Defendant's additional representation that, rather than choosing to "Accept all" cookies, users could instead choose to "Reject all" cookies by clicking or selecting the button to do so.

82.     Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Munoz selected and clicked the "Reject all" cookies button. Plaintiff Munoz believed that selecting the "Reject all" cookies button on the popup cookie consent banner found on the Website would allow him to opt out of, decline, and/or reject all non-essential or non-strictly necessary cookies and other tracking technologies (including all "functional, analytics, and advertising" cookies, and those cookies that cause the disclosure of tracking data to third-party advertising networks and analytics services for such functional, analytics, and advertising purposes).

83.     In selecting the "Reject all" cookies button, Plaintiff Munoz gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Munoz specifically rejected, based on Defendant's representations, those cookies used for "functional, analytics, and advertising purposes" and used to share information with third parties for these and other purposes. In reliance on these representations and promises, only then did Plaintiff Munoz continue browsing the Website.

84.     Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for functional, analytics, and advertising purposes, to be placed on Plaintiff Munoz's device and/or transmitted to the Third Parties along with user data, without Plaintiff Munoz's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Munoz that he could reject the use and/or placement of "all" cookies and tracking technologies, or at least all non-essential cookies

and tracking technologies, while he browsed the Website was false. Contrary to what Defendant made Plaintiff Munoz believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

85.     Then, as Plaintiff Munoz continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Munoz's clear rejection of the use and/or placement of all such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing functional, analytics, and advertising content from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Munoz's Private Communications as Plaintiff Munoz browsed the Website.

86.     Defendant's representations that consumers could "Reject all" cookies while Plaintiff Munoz and users browsed the Website, or at least those non-essential cookies used for functional, analytics, and advertising purposes, were untrue. Had Plaintiff Munoz known this fact, he would not have used the Website. Moreover, Plaintiff Munoz reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to "Reject all" cookies, including all "functional, analytics, and advertising" cookies, except essential cookies, Plaintiff Munoz would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

87.     Plaintiff Munoz continues to desire to browse content featured on the Website. Plaintiff Munoz would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website were programmed to honor users' requests to reject "all" cookies and tracking technologies, Plaintiff Munoz would likely browse the Website again in the future, but will not do so until then. Plaintiff Munoz regularly visits websites that feature content similar to that of the Website. Because Plaintiff Munoz does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject "all" cookies

and tracking technologies, Plaintiff Munoz will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Munoz is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Shirley VanAsch**

88.    Plaintiff VanAsch visited the Website to seek and obtain information about GoFundMe's services and/or view certain fundraising campaigns, while located in California, on one or more occasions during the last four years.

89.    Plaintiff VanAsch's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff VanAsch is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

90.    When Plaintiff VanAsch visited the Website, it immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select the "Reject all" cookies button. Plaintiff VanAsch viewed Defendant's representation on the popup cookie consent banner that, "We use cookies[.] By clicking 'Accept all', you agree to the storing of cookies on your device for functional, analytics, and advertising purposes." Plaintiff VanAsch also viewed Defendant's additional representation that, rather than choosing to "Accept all" cookies, users could instead choose to "Reject all" cookies by clicking or selecting the button to do so.

91.    Consistent with her typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff VanAsch selected and clicked the "Reject all" cookies button. Plaintiff VanAsch believed that selecting the "Reject all" cookies button on the popup cookie consent banner found on the Website would allow her to opt out of,

decline, and/or reject all non-essential or non-strictly necessary cookies and other tracking technologies (including all "functional, analytics, and advertising" cookies, and those cookies that cause the disclosure of tracking data to third-party advertising networks and analytics services for such functional, analytics, and advertising purposes).

92.     In selecting the "Reject all" cookies button, Plaintiff VanAsch gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff VanAsch specifically rejected, based on Defendant's representations, those cookies used for "functional, analytics, and advertising purposes" and used to share information with third parties for these and other purposes. In reliance on these representations and promises, only then did Plaintiff VanAsch continue browsing the Website.

93.     Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for functional, analytics, and advertising purposes, to be placed on Plaintiff VanAsch's device and/or transmitted to the Third Parties along with user data, without Plaintiff VanAsch's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff VanAsch that she could reject the use and/or placement of "all" cookies and tracking technologies, or at least all non-essential cookies and tracking technologies, while she browsed the Website was false. Contrary to what Defendant made Plaintiff VanAsch believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

94.     Then, as Plaintiff VanAsch continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff VanAsch's clear rejection of the use and/or placement of all such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing functional, analytics, and advertising content from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff VanAsch's Private Communications as Plaintiff VanAsch browsed the Website.

95.    Defendant's representations that consumers could "Reject all" cookies while Plaintiff VanAsch and users browsed the Website, or at least those non-essential cookies used for functional, analytics, and advertising purposes, were untrue. Had Plaintiff VanAsch known this fact, she would not have used the Website. Moreover, Plaintiff VanAsch reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to "Reject all" cookies, including all "functional, analytics, and advertising" cookies, except essential cookies, Plaintiff VanAsch would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

96.    Plaintiff VanAsch continues to desire to browse content featured on the Website. Plaintiff VanAsch would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website were programmed to honor users' requests to reject "all" cookies and tracking technologies, Plaintiff VanAsch would likely browse the Website again in the future, but will not do so until then. Plaintiff VanAsch regularly visits websites that feature content similar to that of the Website. Because Plaintiff VanAsch does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject "all" cookies and tracking technologies, Plaintiff VanAsch will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff VanAsch is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

97.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed the Website in the United States after clicking or selecting the "Reject all" button in the popup cookies consent banner.

98.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

99.    **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

100.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject "all" cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

101.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.    Whether Defendant's actions violate California laws invoked herein; and

b.    Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

102.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, rejected all cookies, including all "functional, analytics, and advertising" cookies, except strictly necessary or essential cookies, and had their confidential Private Communications intercepted by the Third Parties.

103.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interest and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

104.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are

unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

105.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

106.    To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs have a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

107.    Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

108.    Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Reject all" cookies and tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members rejected all cookies, including all "functional, analytics, and advertising" cookies, except strictly necessary or essential cookies, and reasonably expected that their rejection of all such cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they rejected such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input

data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

109.    Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

110.    Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

111.    Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

112.    Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

113.    Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

114.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

115.    Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

116.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of "all" non-essential cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

117.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

118.    To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

119.    By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions,

user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

120. The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to "Reject all" cookies.

121. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could "Reject all" cookies, as well as state criminal and civil laws designed to protect individual privacy.

122. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "Reject all" cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they rejected all cookies and tracking technologies, including all "functional, analytics, and advertising" cookies, except those strictly necessary for or essential to the operation of the Website, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session

CLASS ACTION COMPLAINT

information, user identifiers, and/or geolocation data—including whether a user is located in California.

123.    Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

124.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

125.    Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

126.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of "all" non-essential cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action**: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)

127.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

128.    California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

129.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the

other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

130.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

131.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

132.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

133.    Defendant is a "person" within the meaning of California Penal Code § 631.

134.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL

CLASS ACTION COMPLAINT

8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

135.   The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

136.   Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

137.   Under § 631(a), Defendant must show it had the consent of all parties to a communication.

138.   At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused

the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

139.    At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

140.    The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

141.    At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

142.    Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject "all" cookies in the consent banner.

CLASS ACTION COMPLAINT

143.    The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

144.    Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

145.    Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

146.    Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to fundraising. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to reject "all" cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private

Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

147.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

148.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

149.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

150.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

151.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

152.    At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16

(S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

153.    Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

154.    Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by clicking the "Reject all" button in the cookie consent banner.

155.    Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

156.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

157.    Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

158.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

159.    Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could "Reject all" cookies, including all "functional, analytics, and advertising" cookies, except those strictly necessary or essential for the Website to function.

160.    However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked the "Reject all" button in the popup cookie consent banner. These cookies and corresponding software code allowed the

Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "Reject all" cookies.

161.    These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to "Reject all" cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

162.    Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

163.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

164.    Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

165.    Defendant's representation that consumers could "Reject all" cookies (including "functional, analytics, and advertising" cookies, except those strictly necessary or essential for the Website to function) if they clicked the "Reject all" cookies button was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and Cookie Policy prior to their interactions with the Website. Had Defendant disclosed that it caused third-party non-essential cookies to be stored on Website visitors' devices that are used for functional, analytics, and advertising purposes, and/or share information with third parties even after they choose to reject all such cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

166.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject "all" cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

167.    Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

168.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

169.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and

Plaintiffs' and Class members' rejection of the Website's use of "all" non-essential cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Sixth Cause of Action</u>: Unjust Enrichment**

170.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

171.    Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

172.    Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Reject all" cookies, including all "functional, analytics, and advertising" cookies, except those strictly necessary or essential for the Website to function, and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected all such cookies.

173.    Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

174.    Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

175.    Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

176.    It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

177.    There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

178.    Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

179.    Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.    An award of punitive damages;

D.    An award of nominal damages;

E.    An order for full restitution;

F.    An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.    For reasonable attorneys' fees and the costs of suit incurred; and

I.    For such further relief as may be just and proper.

Dated: February 9, 2026

CLASS ACTION COMPLAINT

1

**GUTRIDE SAFIER LLP**

2

*/s/ Seth A. Safier*
 Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
 Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
 Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
 100 Pine Street, Suite 1250
 San Francisco, CA 94111
 Telephone: (415) 639-9090
 Facsimile:  (415) 449-6469

3

4

5

6

7

8

*Attorneys for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT